## SUPREME COURT.

In the Matter of the HARTFORD LIFE AND ANNUITY INSURANCE COMPANY OF HARTFORD, CONNECTICUT.

*Mandamus — When will not be allowed to compel the superintendent of the insurance department to file their annual report required by chapter 256 of Laws of 1881 — Issuance of certificate required by this act in the discretion of the superintendent.*

The supreme court cannot review, by *mandamus,* a matter put in the *quasi* judicial discretion of the superintendent of the insurance department.

The giving of the certificate of authority required by chapter 256 of Laws of 1881, to entitle associations and societies, whether voluntary or incorporated, to do business in this state, is within the discretion of the superintendent of insurance department.

Matter of Hartford Life and Annuity Insurance Company.

Where the annual statement required by this act has been presented to the superintendent, and he has examined the same and has determined against the company on the matter of solvency and ability, a *mandamus* will not be allowed to compel the filing of the same.

Where a company who has been doing business in this state, but has ceased to do business here, and desires again to renew its business, the matter rests with the superintendent to refuse admission if he thinks best.

*Albany Special Term, March,* 1882.

*Kobbe & Fowler* and *M. T. Hun,* for relator.

*Peckham & Rosendale,* for superintendent o' insurance department.

LEARNED, *J.* — The notice of motion in this case was for a *mandamus* to compel the defendant to file the annual statement of the relator for the year 1881, and to issue a reneval certificate of authority to Sherwood Sterling, authorizing him to issue new policies, and authorizing the company to do business in this state. The oral argument of the relator's counsel was to the same effect, that is, it was insisted not only that the annual statement should be filed, but also that the certificate of authority should be issued and the company authorized to do business. The affidavits which were used on the hearing were directed, not so much to the bare right of the relator to file a statement, but to the duty of the superintendent to issue the certificate of authority and to authorize the relator to do business.

But the printed brief handed to the court by the relator subsequently to the argument, states that the *mandamus* is to compel the superintendent to file the statement, and " to proceed to thereafter determine the relator's right to do business in New York." So that by this printed brief the relator seems to abandon that part of the motion which sought to compel the issue of a certificate of authority, and the authorizing the relator to do business, and seems to limit his motion

to the mere filing of the paper, and to the compelling the superintendent to thereafter determine the relator's right to do business in New York.

One very important suggestion at once arises if this position is taken by the relator. It appears by the affidavits presented by the superintendent that he has examined the statement which the relator desires to have him file, and that he considers it unsatisfactory under the statute. Irrespective of the "safety fund certificate" business, he is not satisfied as to the solvency and ability of the company. The affidavits do not merely state this conclusion of the superintendent, but they give, in detail, the facts on which that conclusion is based. And it may be said, in passing, that the facts thus shown, principally from the statement of the relator itself, completely justify the conclusion of the superintendent. Thus it appears that the superintendent has already done one thing which the printed brief asks that he be compelled to do. He has, upon the statement which the relator desires to file, determined adversely the question of its right to do business in this State.

It need hardly be said that this court cannot review by *mandamus* a matter put in the *quasi* judicial discretion of the superintendent. And therefore the only question, according to this printed brief, must be as to the right simply to file the statement; that is, the right to put on the files of the office a statement which the superintendent has had presented to him, which he now shows that he has examined, and from which he has decided that the relator is not in that condition of solvency that he ought to permit it to do business here.

Now, if the relator asks that the superintendent determine its rights, the answer is that he has determined them, on a consideration of that very statement which the relator wishes to file.

If the relator asks simply that the statement be filed, the mere matter of filing is not a thing of any consequence. The superintendent is not a merely ministerial officer, as was the town clerk in *The People* agt. *Collins* (7 *Johns.*, 554).

Nor can the mere filing of the statement be of any value to the relator, so far as I can see, except as a basis of the action of the superintendent. If there be any penalty for not filing, that could not be incurred when the relator had offered to file a statement. If there is any wrong sustained by the refusal to file, the common law remedy is open. There is no special benefit to be obtained by a *mandamus*.

The relator argues that the superintendent cannot determine the relator's rights until after the filing of the statement (*Laws* 1853, *chap.* 463, *sec.* 14). It is very possible that on the mere question of the solvency and ability of the company the superintendent could not decide without an examination of the annual statement. But the superintendent has seen and examined this annual statement, as his affidavits manifestly show. It was presented to him at his office, and he has determined against the relator on the matter of solvency and ability, and, therefore, the question returns, of what benefit can the mere filing be? For the very object of that filing is to obtain the determination of the superintendent. Why ask for a *mandamus* when nothing can be gained by it?

There are, however, some other matters which should be considered, and in considering them it must be noticed that as the case is presented I must take, on any disputed point, the allegations of the answering affidavits as admitted (*People agt. Superintendent*, 73 *N. Y.*, 173).

The relator was authorized to do business in this state (under another name) by chapter 279, Laws of 1867. Subsequently the relator engaged in the business of issuing what are called by it " safety fund certificates." These are certificates by which the relator, in consideration of ten dollars paid, and of three dollars per annum to be paid, agreed to deposit the ten dollars with a certain trustee, and agreed that, on the death of a person holding one of these certificates, an assessment should be made on all persons holding such certificates, and the amount received (not exceeding $1,000) should be paid to the legal representatives of the deceased.

The certificate contains other provisions, but these are enough to indicate its nature.

In August, 1880, the superintendent called the attention of the relator to the matter, and stated that the relator had no right to issue these certificates in this state, and requested the relator to notify its agents that they were prohibited from soliciting for such certificates. To this the relator replied that it would at once notify its agents of the action of the insurance department. Thereupon the superintendent assumed that the relator had ceased issuing such certificates; but he learned the contrary in January, 1881. The deputy superintendent then went to the office of the relator in Hartford, January 14, 1881, and was there informed that the relator was still issuing such certificates. He then informed the secretary of the relator that if this were so the superintendent would not renew the certificates of authority for the ensuing year. The secretary of the relator said that he believed the insurance department could not interfere, if they restricted their canvassing to these safety fund certificates. The secretary of the relator asked the deputy superintendent what the department would do if they should not file their statement? No definite reply was made, and the secretary of the relator said they would gracefully withdraw from the state and not ask for a renewal of its license. The deputy superintendent replied that he would so inform the superintendent, and that the withdrawal would render unnecessary an examination of the books and papers which he was authorized to make.

On the return of the deputy superintendent to Albany, the superintendent issued, January 17, 1881, a notice to the agents of the relator that their authority was revoked.

On the 20th of January, 1881, the relator sent a notice to one of its agents that the insurance department had nothing to do with this safety fund business, and directed him to go on with such business; that the revocation of license only related to "old line business."

On the 12th of May, 1881, chapter 256 of the Laws of

that year was passed, regulating associations which issue certificates to pay money to members, on death or disability, derived from assessments, &c. This required certain designations to be made before July first, and provided for a certificate of authority from the superintendent of insurance department.

In June, 1881, an application was made to the department, with a designation of attorney, &c., of the "New York Safety Fund Co-operative Association." Correspondence followed, and it soon appeared that this so-called association was a department of the relator. Thereupon, on the 2d of July, 1881, the superintendent of the insurance department refused to give a certificate, stating, first, that the act just mentioned did not apply to insurance companies (*see sec.* 6) ; and second, that the relator did not command the confidence of the superintendent. To this the relator's counsel replied, in substance, that they differed with the department.

Further evidence is also given that the relator had been carrying on, in Connecticut and Massachusetts, this business of issuing so-called safety fund certificates, and that this business was managed under a contract with one Henry P. Duclos.

The relator claims that the action of the superintendent in January, 1881, induced it not to file its annual statement until November, 1881, at which time it made an attempt to file the same. But the fact stands out plainly that, on discovering that the superintendent objected to the issue of these certificates by the relator, the relator voluntarily withdrew. The position taken is made clear by the letter to one of its agents, above mentioned, in which the relator says that the insurance department has decided that this safety fund system "is not insurance under their law, and that being so, he, of course, has nothing to do with it." The relator accepted the position which it assumed the insurance department had taken. It took the ground that, with this safety fund business, the insurance department had nothing to do, and, therefore, there was no need to file any annual statement. There never could have

been a delay from January, 1881, to November, 1881, to file the statement for 1880, if it had not been that the relator had decided that it needed no longer the sanction of the insurance department, and that it could carry on this safety fund business without any authority from that department. No claim was made until November, 1881, that it was by the advice or direction of the deputy superintendent that the relator had failed to file that statement.

The relator urges that the notice by the superintendent to its agents was sent within the sixty days after the first of January, within which it might file its statement. But this is immaterial. If the statement was not in fact filed within that time, the superintendent could not properly issue renewal certificates of authority. So that the authority issued to agents of the relator in the previous year would necessarily cease (*Chap.* 463, *Laws* 1853, *sec.* 14). The notice could do no harm, even if it be urged that it was ineffectual. It was for the relator to procure authority for the year 1881, if it desired. And this it did not do. The privilege of doing an insurance business in this state is to be obtained by the performance of certain acts, and when obtained it is to be continued by the like performance at certain definite times. I need not inquire what would be the effect if the superintendent of insurance department had prevented or forbidden the filing of a statement within the proper time. No such case is presented. The relator voluntarily and intentionally neglected to file its statement until it endeavored to do so in November, 1881.

But even if the attempted filing in November, 1881, could be a substitute for the filing which should have been done at the proper time, still I see no reason why the superintendent may not, as he has done, examine the statement, to ascertain the solvency and ability of the relator. And as he was not satisfied of that, it was unnecessary to permit the filing of the statement.

If, on the other hand, this relator having once ceased, as it

might, to do business in this state, desires again to renew its business here, then the matter rests with the superintendent to refuse admission if he thinks best (*Laws* 1873, *chap.* 593, *sec.* 2). Nor do I feel sure that every annual request for a renewal of authority is not an application "to be permitted to transact the business of insurance in this state" under that section. It is familiar law that the right of a corporation of another state to do business here depends on the permission of this state. And a renewal of authority is only a new permission. But it is unnecessary to decide that point.

It is unnecessary also to discuss the merits of the scheme called "safety fund certificate business," although it is not difficult to see what the operation of it will be in the result. That is a matter, if this be treated as a new application, solely within the discretion of the superintendent.

But inasmuch as the relator has urged that the refusal of the superintendent to file the statement was not owing to the want of solvency or ability of the company, but to its attempting to issue these certificates, I have examined the statement on this point of solvency and ability in the respects pointed out by the superintendent. These show, as he claims, improper investments and a failure to comply with the law. Without going over all the objections one or two may be briefly stated.

The certificate of the state treasurer of Connecticut shows, as held by him, seven mortgages credited at $75,500 on Connecticut property. Only four of these are reported in the schedule of mortgages held by the relator. Of the remaining three mortgages, the face value is $66,500, and they are credited at $43,500. From the previous statements of the relator in the department, it is stated to appear that in 1877 the relator claimed to hold these mortgages. In the next year they were not reported, but the property covered by them was set forth as real estate. The same in the next year. And, in the moving papers, this property appears as real estate owned by the company, cost value $70,151.38, while the state treasurer returns mortgages on these same pieces of property, as above

stated. This fact, uncontradicted, is enough to condemn the statement. No explanation is made in the printed brief of the relator.

Again, the affidavit of the superintendent shows that the relator has, by its statement, 772 mortgages in Kansas, amounting to over $312,000 ; that it reports $85,840 of mortgages in Connecticut, of which about $50,000 are on vacant land, leaving about $36,000 on "improved" land in Connecticut. The statement of the treasurer of Connecticut shows $76,500 of mortgages on "improved" land.

Again, the relator is authorized by its charter to invest, among other securities, "in any bonds or stocks of any corporation which are or may be created under authority of the United States or of any of the states." No corporation authorized to make such investments, should be permitted to do an insurance business in this state.

The motion for a *mandamus* is denied, with costs.